## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

MICHAEL REITERMAN,

      PLAINTIFF,
      COUNTERDEFENDANT     Case No.: 8:19-CV-02282-WFJ-AAS

V.

FARAH ALI ABID,

      DEFENDANT,
      COUNTERPLAINTIFF.
_____/

## <u>DEFENDANT'S ANSWER, AFFRIMATIVE DEFENSES, AND COUNTERCLAIM</u>

COMES NOW the Defendant, FARAH ALI ABID, by and through the undersigned counsel, hereby files her Answer, Affirmative Defenses, and Counterclaim as a Responsive Pleading to Plaintiff's Complaint (ECF Doc. 1) and would state as follows:

PARTIES, JURISDICTON AND VENUE

1.    Admitted for jurisdictional purposes only.

2.    Admitted for jurisdictional purposes only.

3.    Admitted for jurisdictional purposes only.

4.      Admitted for jurisdictional purposes only, otherwise denied.

## FACTS COMMON TO ALL COUNTS

5.      Unknown, therefore denied.

6.      Denied.

7.      Denied.

8.      Denied.

9.      Unknown, therefore denied.

10.     Denied.

11.     Unknown, therefore denied.

12.     Denied.

## The Parties Meet in Florida, etc.

13.     Admitted.

14.     Denied.

15.     Denied.

16.     Denied.

17.     Unknown, therefore denied.

18.     The Tampa Police report speaks for itself, otherwise denied.

19.     Unknown, therefore denied.

Ms. Abid's Alleged "Campaign"

20.    Denied.

21.    Denied, as to introduction and "a" through "h" denied.

22.    Denied.

23.    Unknown, therefore denied.

24.    Denied.

25.    Denied.

26.    Denied.

27.    Unknown, therefore denied.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Denied.

32.    Denied.

33.    Denied.

34.    Denied.

35.    Denied.

36.    Denied.

37.   Denied.

38.   Denied.

39.   Denied.

40.   Denied.

41.   Denied.

42.   Denied.

## Mr. Reiterman's Diligent Efforts, etc.

43.   Unknown, therefore denied.

44.   Unknown, therefore denied.

45.   Unknown, therefore denied.

46.   Unknown, therefore denied.

47.   Unknown, therefore denied.

48.   Unknown, therefore denied.

49.   Unknown, therefore denied.

## Mr. Reiterman's Two Prior Lawsuits, etc.

## The Florida Lawsuit

50.   Admitted that the suit was filed, otherwise denied.

51.   Settlement discussions are confidential, otherwise denied.

52.   Settlement discussions are confidential, otherwise denied.

53.   The Settlement Agreement speaks for itself, otherwise denied.

54.   Unknown, therefore denied.

55.   Settlement discussions are confidential, otherwise denied.

56.   Settlement discussions are confidential, otherwise denied.

57.   The Settlement Agreement speaks for itself, otherwise denied.

58.   The Settlement Agreement speaks for itself, otherwise denied.

59.   Unknown, therefore denied.

60.   Unknown, therefore denied.

61.   Unknown, therefore denied.

62.   Denied.

63.   Denied.

64.   Denied.

The California Lawsuit

65.   Unknown, therefore denied.

66.   Unknown, therefore denied.

67.   Unknown, therefore denied.

68.   Admitted.

69.    Admitted that the California lawsuit was dismissed.

70.    Unknown, therefore denied.

Discovery From Prior Litigation, etc.

71.    Denied, in its entirety "a" through "d."

72.    Denied, and the PI's sworn statement is denied.

73.    Unknown, therefore denied.

74.    Unknown, therefore denied.

75.    The demand letter speaks for itself, otherwise denied.

76.    Abid's response speaks for itself, otherwise denied.

77.    Denied.

COUNT I

Fraudulent Inducement and Rescission

78.    Ms. Abid incorporates by reference each and every response set forth in the foregoing paragraphs.

79.    Denied.

80.    Unknown, therefore denied.

81.    Unknown, therefore denied.

82.    Unknown, therefore denied.

83.   Unknown, therefore denied.

84.   Case law speaks for itself, otherwise denied.

85.   Denied.

86.   The request speaks for itself, otherwise denied.

## COUNT II

### Fraudulent Misrepresentation

87.   Ms. Abid incorporates by reference each and every response set forth in the foregoing paragraphs.

88.   Denied.

89.   Denied.

90.   Denied.

91.   Denied.

92.   The request speaks for itself, otherwise denied.

## COUNT III

### Breach of Contract

93.   Ms. Abid incorporates by reference each and every response set forth in the foregoing paragraphs.

94.   The alternative pleading speaks for itself, otherwise denied.

95.   The Settlement Agreement is confidential, otherwise denied.

96.   The Settlement Agreement is confidential, otherwise denied.

97.   Denied.

98.   Denied.

99.   The request speaks for itself, otherwise denied.

COUNT IV

Defamation *Per Se*

100.  Ms. Abid incorporates by reference each and every response set forth in the foregoing paragraphs.

101.  Denied.

102.  Denied.

103.  Unknown, therefore denied.

104.  Unknown, therefore denied.

105.  Unknown, therefore denied.

106.  Denied.

107.  The statements speak for themselves, otherwise denied.

108.  Unknown, therefore denied.

109.   Unknown, therefore denied.

110.   Unknown, therefore denied.

111.   Denied.

112.   The request speaks for itself, otherwise denied.

113.   The request speaks for itself, otherwise denied.

COUNT V

Defamation *Per Quod*

114.   Ms. Abid incorporates by reference each and every response set forth in the foregoing paragraphs.

115.   Ms. Abid incorporates by reference each and every response to Count IV as they pertain to Count V.

116.   The request speaks for itself, otherwise denied.

117.   The request speaks for itself, otherwise denied.

COUNT VI

Tortious Interference with Relationships

118.   Ms. Abid incorporates by reference each and every response set forth in the foregoing paragraphs.

119.   Unknown, therefore denied.

120.   Denied.

121.   Denied.

122.   Unknown, therefore denied.

123.   Denied.

124.   The request speaks for itself, otherwise denied.

## COUNT VII

## Intentional Infliction of Emotional Distress

125.   Ms. Abid incorporates by reference each and every response set forth in the foregoing paragraphs.

126.   Denied.

127.   Denied.

128.   Unknown, therefore denied.

129.   The request speaks for itself, otherwise denied.

## PRAYER FOR RELIEF

WHEREFORE, the Defendant. Farah Abid respectfully requests this Court deny any relief as requested by Plaintiff.

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative defenses as full and complete defenses to all claims asserted by the Plaintiff in the operative Complaint, and would state as follows:

1. Plaintiff's Complaint, and each and every cause of action set forth therein, fails to state a cause of action against Defendants.

2. Defendant states that Plaintiff's alleged injuries were caused, in whole or in part, by the negligence of a third party whom Defendant had no control over, and liability should be apportioned to these third parties pursuant to *Fabre v. Marin,* 623 So.2d 1182 (Fla. 1993) and its progeny.

3. Defendant states that Plaintiff's damages, if any, assessed against Defendant, should be reduced because of Plaintiff's comparative and/or contributory negligence in engaging in conduct wholly or partially created Plaintiff's damages.

4. The Defendant asserts that, while the Defendant denies that the Plaintiff is entitled to any recovery whatsoever, to the extent that the Plaintiff's alleged damages are caused, in whole or part, by third

parties who are not parties to this action, liability shall be apportioned according to fault, irrespective of whether such third parties become parties to this action.

5.   Defendant states that Plaintiff failed to mitigate any of the damages allegedly sustained by Plaintiff.

6.   Plaintiff assumed the risk of any damage from any source based upon his intentional misconduct.

7.   Defendant would state that each and every one of Plaintiff's claims are barred by the doctrine of unclean hands. The Plaintiff's wrongful conduct precludes Plaintiff from seeking relief and all claims should be dismissed.

8.   Defendant states that each and every one of Plaintiff's claims are barred by the doctrine of waiver.

9.   Defendant states that each and every one of Plaintiff's claims are barred by the doctrine of estoppel.

10.   Defendant states that each and every one of Plaintiff's claims are barred by the applicable statute of limitations.

11.     Defendant states that each and every one of Plaintiff's claims are barred by the doctrine of res judicate and collateral estoppel.

12.     Defendant states that each and every one of Plaintiff's contract claims are barred by formation problems, lack of capacity, illegality of subject matter, impossibility, duress, unconscionability, and undue influence.

13.     Defendant states that each and every one of Plaintiff's defamation claims are barred because any statement made by any party describing the Plaintiff's wrongful conduct is the substantial truth, is subject to the opinion and fair comment privilege, and also subject to the fair report privilege.

14.     Defendant states that each and every one of Plaintiff's tortious interference claims are barred because any statement made by any party describing the Plaintiff's wrongful conduct is the substantial truth and any dissemination of Plaintiff's wrongful conduct by any party would be a justifiable reason for any alleged interference.

15.     Defendant states that each and every one of Plaintiff's intentional infliction of emotional distress claims is barred because any

statement made by any party describing the Plaintiff's wrongful conduct is the substantial truth and any dissemination of Plaintiff's wrongful conduct would be protected by the First Amendment and therefore not outrageous or improper.

16.    Defendants reserve the right to supplement these affirmative defenses as they may become known through discovery or the administration of this case.

## COUNTERCLAIM

1.    Plaintiff Farah Abid ("Ms. Abid"), by and through undersigned counsel, hereby sues Defendant Michael Zachary Reiterman (the "Defendant" or "Defendant Reiterman"), seeking damages in connection with Defendant Reiterman's intentional, extreme, outrageous, and illegal acts, as set forth below.

2. Ms. Abid brings causes of action for malicious prosecution, harassment, stalking, trespass, and intentional infliction of emotional distress. In support of this Complaint, Ms. Abid asserts the following:

## PARTIES, JURISDICTION & VENUE

3.    Plaintiff Farah Abid is a citizen of Florida.

4.      Defendant Michael Zachary Reiterman is a resident and citizen of California and, upon information and belief, is domiciled with his parents in Santa Clara County, California.

5.      This Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1332(a), because this is a civil action where the controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states. There is a complete diversity of citizenship between Ms. Abid (a Florida citizen) and Defendant Reiterman (a California citizen and resident).

6.      The U.S. District Court for the Middle District of Florida is the proper venue for this matter pursuant to 28 U.S.C. § 1391, because upon information and belief, a substantial part of the events giving rise to the claims alleged herein, including the harassment and stalking campaign Defendant Reiterman has engaged in against Ms. Abid and her family and friends occurred within the territorial limits of the Middle District of Florida.

FACTS COMMON TO ALL COUNTS

Introduction

7.     Plaintiff Ms. Abid is a law school student with big dreams and aspirations. Ms. Abid got into law school on a full-ride scholarship and during her time in law school served as president of the Muslim Law Student Association. She also worked as an interpreter and translator of five languages at her school for various legal clinics where she helped asylum seekers, refugees, and indigent persons who couldn't afford legal counsel.

8.     During her time in law school, Ms. Abid authored over three papers on tort reform to address sexual abusers who manipulate the legal system to harass their victims in court. She was awarded the Gold Public Service Award in law school for volunteering over 1,500 hours of her time as a law student to provide legal services to refugees (in particular, she spearheaded emergency legal services for Afghan refugees seeking asylum in America), survivors of sexual abuse, asylum seekers, persons facing political persecution, small business owners, persons falsely accused of crimes, whistleblowers, the New York City government, and low-income persons in need of legal help.

9.     Ms. Abid played a major role in the passage of a landmark bipartisan bill through Congress that was recently signed into law by President Biden. Her political acumen was so highly lauded that she was offered a position with a Washington, D.C.-based think tank, which is almost unheard of for anyone of Ms. Abid's age. 10. Moreover, Ms. Abid has relied on her traumatic experiences with Defendant Reiterman both inside and outside of court to become a consultant for cases involving persons who have been sexually abused.

10.     In fact, Ms. Abid was hired at one organization solely because of the experience and the perspective she has amassed as a sexual abuse survivor litigant in the present action, which her employer considered invaluable. Ms. Abid has worked for both the state and federal government and city-level municipalities in prestigious positions and has had to pass high-level security clearance for not only these positions, but also for the work she has done with infants.

11.     Regrettably, as a result of Defendant Reiterman's sexual assault on Ms. Abid on July 7, 2014, and the series of vicious and malicious attacks, which include stalking and harassment, that Defendant

Reiterman has instigated on Ms. Abid and her family and friends, Ms. Abid has suffered immense physical, psychological, and emotional pain.

The History between Reiterman and Ms. Abid

12.     Defendant Reiterman brutally sexually assaulted and battered Ms. Abid

13.     As of March 2014, Ms. Abid was a young student with dreams of attending law school. Ms. Abid's grandfathers had been tribal administrators of justice in their respective villages, so she felt destined for the legal profession.

14.     Ms. Abid is a very religious Muslim who observes the hijab, an Islamic headcovering, and has always been an active member of her Muslim community, teaching Quran at Sunday school and serving on the youth board of her mosque.

15.     Ms. Abid understood that a strong score on the Law School Admission Test ("LSAT") was crucial to her goals of being admitted to a top law school.

16.     Ms. Abid decided to enroll in TestMasters, a test preparation company, on or about April 1, 2014. The course, which would run from April through June 2014, took place at the Tampa, Florida campus of the University of South Florida.

17.     Based on TestMasters' reputation for success and the training and qualifications of TestMasters' pool of professors, Ms. Abid's parents excitedly agreed with their daughter on her choice to enroll in a TestMasters' LSAT test prep course. Ms. Abid paid $1,450 for the course and arranged to rent an apartment near the location of the course so that she could optimally focus on studying for and passing the LSAT.

18.     Multiple hour classes were held several times a week, and students were assigned lengthy homework assignments between classes. Ms. Abid diligently completed these assignments.

19.     Defendant Reiterman was the TestMasters professor for Ms. Abid's class. Ms. Abid was his student.

20.     On information and belief, TestMasters' policies and procedures prohibit its professors from engaging in inappropriate personal and/or sexual relationships with students.

21.     Defendant Reiterman provided his professional and personal email and personal cell phone number to Ms. Abid, offered to meet Ms. Abid outside of scheduled class hours for extra LSAT tutoring, and on multiple occasions did, in fact, meet with Ms. Abid outside of scheduled class hours.

22.     Defendant Reiterman invited Ms. Abid to call him with LSAT questions on his cell phone, and Ms. Abid did so, based on the understanding that Defendant Reiterman had made the offer for additional LSAT guidance as a teacher for TestMasters. When Ms. Abid called Defendant Reiterman with LSAT questions, he quickly turned the conversation to personal and often uncomfortable and inappropriate subjects after answering her LSAT questions. On information and belief, Defendant Reiterman arranged for these calls and his position with TestMasters in order to establish an inappropriate relationship with Ms. Abid.

23.     It was apparent to Ms. Abid's classmates and others, including at least one other employee of TestMasters, that Defendant Reiterman was attempting to cultivate an inappropriate relationship with Ms. Abid. During a class from one of the final weeks of the LSAT prep course session, a substitute TestMasters professor filled in for Defendant Reiterman.

24.     This substitute TestMasters' professor made statements to Ms. Abid that revealed his suspicion that Defendant Reiterman had developed an inappropriate relationship with Ms. Abid. On yet another occasion, the class assistant asked Ms. Abid about Defendant Reiterman's behavior.

25.     All told, over the course of multiple weeks, Defendant Reiterman used the power and influence he exercised over Ms. Abid as a professor for TestMasters to invite her to meet with him privately outside of class for LSAT tutoring and to call him on his cell phone late into the night.

26.     On June 7, 2014, Defendant Michael Reiterman invited Ms. Abid to his apartment. During this encounter, Reiterman brutally and viciously sexually assaulted Ms. Abid. Reiterman dug his nails deep

into Ms. Abid's back, which created scarring. Reiterman then bit into Ms. Abid's shoulders, chest, and upper arms. Reiterman physically tore and flayed skin off Ms. Abid's body with his teeth, causing scars of his teeth imprints on Ms. Abid's body. Reiterman rubbed his genitals up against Ms. Abid's body and moaned while he did this. Reiterman violently kneed Ms. Abid in her crotch area multiple times and tried to tear her clothes off, even as she screamed and fought Reiterman off.

27.    At one point, Reiterman took off Ms. Abid's shoes, presumably to prevent her from running away. Reiterman then attempted to touch Ms. Abid's private parts through her clothes to rape her, but she was able to fight Reiterman off of her. Reiterman then strangled Ms. Abid, digging his nails into Ms. Abid's neck until she nearly blacked out. When Ms. Abid, who couldn't speak at this point from exhaustion and terror, mouthed the words "why" to Reiterman, he replied "well it didn't work."

28.    Reiterman then pinned Ms. Abid's arms back and forcefully kissed her against her will. Reiterman then whipped Ms. Abid with his belt, which created welts on her back and muffled her cries by pressing

her face into his chest. At no point did Ms. Abid consent to this attack.

Ms. Abid repeatedly pushed Reiterman away and screamed "No."

29.    Reiterman ignored Ms. Abid's repeated rejections and pressed on with the assault. After Reiterman was finished assaulting and beating Ms. Abid, Reiterman ejaculated into his pants and told Ms. Abid "You did that."

30.    After the assault and still on June 7, 2014, Ms. Abid frantically phoned Dr. Carolyn Dixon, a family friend and physician, and requested an emergency medical visit. Dr. Dixon made a house call to see Ms. Abid in private and administered medical care to her. Over the course of the next month or so, Ms. Abid's mother wrote out checks to Dr. Dixon for Ms. Abid's medical care.

31.    Dr. Dixon treated Ms. Abid's lingering wounds from Defendant Reiterman's sexual assault, namely the deep scratch and bite marks Defendant Reiterman had inflicted on her, which had become infected and were so excruciating that Ms. Abid couldn't sleep on her back. During this time, Ms. Abid's physical and mental condition drastically deteriorated to the point that her family no longer recognized her.

32.   Ms. Abid had always been outgoing, physically active, and enjoyed spending time with her friends at the beach. After June 7, 2014, Ms. Abid locked herself in her closet, constantly cried for sometimes hours or nights on end, lost an alarming amount of weight, stopped sleeping, and began engaging in self-harm and suicidal tendencies. Because Ms. Abid became so nutritionally deficient during this time, the wounds Defendant Reiterman inflicted on her body wouldn't heal. Other family members and friends, and even acquaintances noticed the sudden drastic change in Ms. Abid and mentioned it to her parents, who were growing increasingly worried.

33.   After a life-threatening incident, Ms. Abid's parents pushed her into therapy, where she was diagnosed with Post-Traumatic Stress Disorder ("PTSD"), depression, and anxiety as a direct result of Defendant Reiterman assaulting her. Dr. Dixon recommended to Ms. Abid's mother that Ms. Abid be taken into a medical rehabilitation facility because her mental and physical condition had deteriorated so badly.

34.    In September of 2014, months after the assault, Defendant Reiterman texted Ms. Abid to ask what she had done for the rest of the summer and if she had taken the LSAT. Ms. Abid didn't respond and blocked his email and phone number. She then threw her phone into a nearby planter and began sobbing on the floor of her family's living room.

35.    Ms. Abid was unable to complete the TestMasters course and did not take the LSAT that year or any year for that matter.

36.    As a result of the emotional and physical damage Ms. Abid suffered from Defendant Reiterman's assault and battery, for nearly a year, Ms. Abid's parents spent a considerable sum of money for her to attend individualized therapy and group therapy sessions and arranged for appointments with a nutritionist and various medical practitioners.

37.    Ms. Abid's parents were forced to prematurely terminate the lease on the Tampa apartment that Ms. Abid was residing in during her the time she was prepping for the LSAT with Testmasters because she was too traumatized to return to it. Ms. Abid's therapist provided a

letter to the apartment's management explaining that Ms. Abid had been sexually assaulted and because of her trauma could no longer return to the apartment because it triggered flashbacks.

38.   Any LSAT preparation Ms. Abid attempted after Defendant Reiterman sexually assaulted her triggered her memories of the sexual assault and resulted in painful flashbacks that were paralyzing. Indeed, Ms. Abid was only able to apply for law school admission in 2019 once law schools began accepting the Graduate Record Examination ("GRE") as an alternative to the LSAT.

39.   Over the course of a very difficult year for both Ms. Abid and her family, Ms. Abid slowly showed signs of improvement, though she would continue to be in treatment, all of which her parents paid for, for many more years to recover from Defendant Reiterman's violent sexual assault.

40.   The women of Ms. Abid's therapy group encouraged Ms. Abid to hold Defendant Reiterman accountable for the devastating sexual assault he inflicted on her, and when Ms. Abid did report the assault to

the Tampa Police Department, she was accompanied by a friend from her therapy group for emotional support.

41.    The Tampa Police Department told Ms. Abid that because a year had passed since she was assaulted, no charges would be filed against Defendant Reiterman. However, the officers encouraged Ms. Abid to put her assault on record because they found Defendant Reiterman's behavior particularly egregious and disgusting.

**In 2016, Reiterman Offers to Pay Ms. Abid Damages for Sexually Assaulting Her; Reiterman's Former Employer Offers to Pay Ms. Abid Damages for Reiterman's Sexual Assault**

42.    Around the Spring of 2016, Ms. Abid, with support from the women of her therapy group, all of whom had experienced some form of sexual abuse, sought, and retained pro bono counsel, an attorney nationally renowned for  representing sexual assault victims, through the Florida Council Against Sexual Violence in the hopes of holding Defendant Reiterman accountable for sexually assaulting her.

43.    While Defendant Reiterman and his retained counsel initially scoffed at Ms. Abid's claims, Defendant Reiterman quickly changed his tone after reviewing a few of Ms. Abid's witness statements, many of which included persons who personally saw the extent of Ms. Abid's shocking physical injuries, a few therapy records, and some photographs taken by a professional forensic photographer of the intense scarring Defendant Reiterman inflicted on Ms. Abid's body.

44.    Defendant Reiterman offered Ms. Abid $5,000. Defendant Reiterman claimed that though he endeavored to pay Ms. Abid at least $150,000 if he were able, all he could afford at the time was $5,000 because he had big loans and down the road intended to go into a field of public law that didn't pay well. Defendant Reiterman also told Ms. Abid that he was "judgment proof."

45.    Around September of 2016, TestMasters contacted Ms. Abid to inquire about their disgraced former employee, Michael Zachary Reiterman. Ms. Abid had not told TestMasters about the assault at this point. Through counsel, Ms. Abid sent TestMasters some witness statements, evidence, and records, and provided a statement to

TestMasters of how Defendant Reiterman viciously and brutally sexually assaulted and beat her. TestMasters offered Ms. Abid a sum of money for damages.

46.    During this time, Ms. Abid learned from TestMasters that they had fired Defendant Reiterman in June of 2016, well before TestMasters contacted Ms. Abid. Testmasters found Defendant Reiterman's behavior shocking to the conscience and repulsive and described him as an employee with a poor track record.

47.    In 2018, Reiterman Launches His Devastating and Malicious Campaign of Harassment, Stalking, and Abuse Against Ms. Abid and Her Family

A.    The First Florida Lawsuit — 2018

48.    On April 4, 2018, Defendant Reiterman sued Ms. Abid, claiming she had published a series of defamatory blog posts that painted Defendant Reiterman as a racist serial rapist who sexually abused women. Defendant Reiterman further blamed Ms. Abid for nearly every misfortune that had befallen him while he was a student at

Harvard Law School. Some of these "misfortunes," as detailed by Defendant Reiterman himself in his lawsuit include:

a.    Rumors that were spread on Harvard Law School's campus that Defendant Reiterman was a serial rapist.

b.    Title IX complaints filed by other students against Defendant Reiterman on Harvard Law School's campus.

c.    Emails sent from the anonymous email address harvardlawstudent123456789@gmail.com to Defendant Reiterman's professors, friends and peers claiming to be a 3rd year law student who didn't feel safe coming to class because she believed Defendant Reiterman was a "psychotic sadist."

d.    A petition launched on Change.org urging the Dean of Harvard Law School to expel Defendant Reiterman from campus.

e.    A female student at Harvard Law School writing an email to the Deans and Title IX coordinators demanding Defendant Reiterman be expelled from campus because he posed a risk to women on campus.

  f. Defendant Reiterman's former employer and Harvard Law School receiving a flood of calls about Defendant Reiterman's sexual misconduct.

49. Ms. Abid has absolutely nothing to do with the aforementioned. Ms. Abid did not create any defamatory material about Defendant Reiterman online and denied all of his baseless accusations. Moreover, in the United States, only students enrolled at the same school can file Title IX claims, which exclusively concern sexual violence against a fellow student. Ms. Abid was not an enrolled student at Harvard Law School.

50. Harvard's Title IX policy limits the school's jurisdiction to misconduct that occurs either on Harvard property or off Harvard property if: "a) the conduct was in connection with a University or University-recognized program or activity; or b) the conduct may have the effect of creating a hostile environment for a member of the University community."

51. From the moment Defendant Reiterman filed the lawsuit against Ms. Abid until the day the lawsuit was dismissed, Defendant

Reiterman's counsel demanded that Ms. Abid sign a sworn affidavit stating that Defendant Reiterman never sexually assaulted Ms. Abid and that she created all the defamatory Internet postings about him. Defendant Reiterman's counsel also demanded all of Ms. Abid's journals. Ms. Abid steadfastly refused to write the statement and continually asserted the truth — Defendant Reiterman did sexually assault Ms. Abid and she played no part in the defamatory material that had been posted about Defendant Reiterman nor did she share any defamatory statements about Defendant Reiterman on Harvard Law School's campus.

52.    In June of 2018, while Ms. Abid was seeking counsel, Defendant Reiterman's counsel emailed her stating that he wanted to personally speak to her, but that if she didn't want to talk to him to discuss Defendant Reiterman's demands, he was going to litigate the matter. Ms. Abid forwarded his email to a few attorneys from a nationally renowned firm that the Legal Network for Gender Equity and the TIME's UP Legal Defense Fund had referred her to, who found the email appalling and reminiscent of the strategy used by Harvey

Weinstein's legal team to pressure young women he had sexually abused into signing non-disclosure agreements.

53.    Through the National Women's Law Center and the Victim Rights Law Center, Ms. Abid was able to retain Quarles Brady and Goodwin Procter as pro bono counsel.

54.    In May of 2018, The Executive Director of the Victim Right's Law Center, the most renowned legal center in the United States for victims of sexual abuse, sent a letter to Harvard Law School's Title IX Coordinator, General Counsel, and the Dean of Students to investigate Reiterman out of concern for what they believed was Defendant Reiterman's pattern of victimization specifically targeting girls from immigrant families and the safety risk he posed to the Harvard Law School community. Harvard Law School declined to discuss Defendant Reiterman's case.

55.    Around May of 2018, Defendant Reiterman's counsel once again demanded that Ms. Abid sign a sworn affidavit stating that Defendant Reiterman never sexually assaulted her and that she had created all the defamatory Internet postings. Ms. Abid steadfastly refused.

56.     Defendant Reiterman agreed to settle with Ms. Abid when her counsel informed him that they planned on filing counterclaims for sexual assault and battery.

57.     In 2018, Reiterman agrees for the second time to pay Ms. Abid damages for sexually assaulting her and foregoes his employment opportunity at Skadden.

58.     On June 26, 2018, Defendant Reiterman and Ms. Abid engaged in a settlement conference in which Defendant Reiterman was represented by not only Florida counsel, but also Skadden, Arps, Slate, Meagher & Flom ("Skadden"), a nationally renowned law firm based in New York, and Defendant Reiterman's prospective employer at the time.

59.    At the conclusion of the settlement conference, Defendant Reiterman agreed to pay Ms. Abid $25,000, and also agreed that in the event he became a licensed and practicing attorney and found employment with a law firm, he would pay "double the amount of the monthly installment each month following his first full month of

employment at said law firm." Defendant Reiterman also agreed to dismiss the lawsuit he had filed against Ms. Abid.

60.   Ms. Abid's counsel agreed to dismiss the lawsuit they filed against TestMasters for negligently supervising Defendant Reiterman during his time as an instructor for TestMasters as part of the terms of the settlement agreement.

61.   Defendant Reiterman's counsel informed Ms. Abid that Defendant Reiterman had lost his job offer with Skadden because he chose to pay Ms. Abid for damages arising from sexually assaulting her in 2014 as part of the terms of the settlement agreement.

62.   The judge in the 2018 action dismissed Defendant Reiterman's suit with prejudice.

63.   The 2018 settlement agreement marked the second time since 2016 that Defendant Reiterman has agreed to pay Ms. Abid for damages that are the result of a sexual assault Defendant Reiterman still claims he didn't commit.

### B. The California Lawsuit — 2019

64.    Around the Spring of 2019, Ms. Abid became aware of a man who was following her in Sarasota, Florida. This man, Nicholas Evans, formerly of ZapServe Investigations & Process Services (Evans is now self-employed at Evans Investigations), would later go on to stalk, harass, and intimidate Ms. Abid's family in the 2019 Florida lawsuit. Evans followed Ms. Abid to her group therapy sessions and her day-to-day activities.

65.    In April of 2019, Defendant Reiterman contacted Ms. Abid via new counsel. For the first time since Defendant Reiterman initiated legal actions against Ms. Abid, Defendant Reiterman was represented by female counsel. Defendant Reiterman alleged the same claims as the 2018 suit, although now he purported to have new evidence against Ms. Abid.

66.    In his demand letter to Ms. Abid, Defendant Reiterman stated that if she wanted to make all of his claims against her go away, she needed to write a sworn affidavit retracting her claims of sexual assault, explaining the falsity of her statements, and write that she had created all the defamatory Internet postings about Defendant

Reiterman. Defendant Reiterman stated that he would be sending Ms. Abid's statement to the Bar Examiners of Washington D.C., New York, and California; the Dean and Associate Deans of Harvard Law School and Harvard Law School's General Counsel; Defendant Reiterman's former employer, TestMasters, his former prospective employer, Skadden, and anyone else of Defendant Reiterman's choice.

67.     Ms. Abid, feeling defenseless, scared, and once again in a familiar position with Defendant Reiterman exercising his authority in a position of power over her, sent a hasty email without legal counsel containing mere puffery to Defendant Reiterman's counsel hoping that they would leave her alone. This email would later be used by Defendant Reiterman's counsel to assert that Ms. Abid didn't want to honor the terms of the settlement agreement when in reality all Ms. Abid wanted was for the protection the settlement agreement gave her from Defendant Reiterman's abuse to stay in place.

68.     In May of 2019, Defendant Reiterman served Ms. Abid at her group therapy session in Sarasota, Florida with a suit he filed in California Superior Court alleging nearly identical claims to the 2018

lawsuit. Defendant Reiterman's lawsuit named Ms. Abid as "Doe" 1, though the other 9 Doe Defendants were not named.

69.    Defendant Reiterman had hired Evans to watch Ms. Abid for months before serving her in Florida with a lawsuit filed in California. Defendant Reiterman knew full well that Ms. Abid lived in Sarasota, Florida, but outrageously claimed in his California suit that Ms. Abid lived near him and his mother in Santa Clara County, California.

70.    Ms. Abid has never lived in California and only visited the state once when she was a child. Defendant Reiterman also outlandishly claimed that Ms. Abid and her "agents" had been stalking, harassing, and subjecting Reiterman to "violence" in California, which simply isn't true. Moreover, Defendant Reiterman had no evidence whatsoever to support his claims.

71.    On July 2, 2019, Ms. Abid filed a motion via counsel to dismiss the complaint, arguing that the California court lacked personal jurisdiction over her.

72.     On July 30, 2019, the California court granted Ms. Abid's motion to dismiss on jurisdictional grounds and dismissed Defendant Reiterman's action.

73.     While Defendant Reiterman's counsel claimed in the 2019 Florida Complaint that the California Court noted it was "troubled" by "evidence" Defendant Reiterman presented supposedly linking Ms. Abid to the defamatory blog posts, the transcript from the court hearing shows that the Court didn't make these statements.

74.     The sole reason Defendant Reiterman engaged in vexatious litigation against Ms. Abid in California was to cause her undue financial and emotional distress.

75.     At the conclusion of the California suit, Ms. Abid offered Defendant Reiterman's counsel her cellphone and personal computer for inspection. Defendant Reiterman's counsel declined. This was Ms. Abid's attempt to end these harassing and vexatious lawsuits Defendant Reiterman was subjecting her to once and for all, yet Defendant Reiterman, knowing full well Ms. Abid was innocent, declined her electronics.

Reiterman's Agent, Nicholas Evans, Stalks, Harasses, and Commits

Battery Against the Abid Family

76.    Nicholas Evans, the man Defendant Reiterman hired to stalk, harass, and intimidate Ms. Abid's family, and thus Reiterman's "Agent," is a one-time employee of the Bradenton police department. Evans made national headlines in 2007 when, according to a Gainesville Sun news article, he arrested a homeless woman and dragged her cart full of belongings alongside his patrol car for an hour. (https://www.gainesville.com/story/news/2007/01/19/officer-reassigned-over-shopping-cart-pull/31509325007/).

77.    In a second incident, Evans violated a supervisor's order and dragged another shopping cart alongside his car while driving on a public road. After these incidents, Evans was reassigned to desk duty and quit the Police Department shortly thereafter.

78.    Beginning around September of 2019, Nicholas Evans, as Reiterman's agent, began stalking and harassing Ms. Abid's parents. Evans refused to identify himself, but repeatedly pressed Ms. Abid's parents about the whereabouts of their daughter, Ms. Abid. Evans

often wore polarized sunglasses that obscured his eyes and would move in a physically imposing and aggressive manner that was meant to intimidate members of the Abid family.

79.   Evans, as Reiterman's agent, would follow Ms. Abid's mother during her day-to-day activities, and even harassed her outside a local grocery store while she was loading groceries into her car. Evans threatened Ms. Abid's mother, stating that if she didn't reveal the whereabouts of her daughter, there would be trouble.

80.   Evans, as Reiterman's agent, began parking in the driveway of the Abid family home and would harass Ms. Abid's parents as they left their family residence. Evans would often scream at the Abid family members, urging them to reveal Ms. Abid's location.

81.   In and around October 2019, Ms. Abid's father called the Sarasota County Sheriff's Department and reported Evans for harassment and stalking. Thereafter, the Sarasota County Sheriff's Department offered nighttime patrol to Ms. Abid's family for their own safety.

82.   Around November of 2019, Evans, as Reiterman's agent, reappeared at the Abid residence where he climbed onto the family's house up to a set of glass windows and banged on the windows with a flashlight while screaming "Federal subpoena! Exit the house immediately." Ms. Abid's family was utterly terrified and called the police, but Evans had run off by then.

83.   In November of 2019, Evans, as Reiterman's agent, once again reappeared at the Abid family home and knocked on a backdoor entrance to the house. Ms. Abid's father opened the door and confronted Evans, demanding that he identify himself. Evans physically pushed Ms. Abid's father away, at which point Ms. Abid's father pushed him back. Evans then immediately ran away.

84.   Defendant Reiterman's counsel mentioned this situation in a declaration filed with the court, and stated that Ms. Abid's father, a cardiologist dedicated to saving lives every day, initiated a physical altercation with Evans, which is absolutely false. Evans, as Reiterman's agent, was the sole aggressor in all his interactions with members of

the Abid family and, at Defendant Reiterman's command, engaged in a thuggish aggressive campaign against the Abid family.

85.   At the suggestion of the Sarasota County Sheriff's Department, Ms. Abid's father spent a considerable sum of money installing security cameras all over his property so that if Evans returned, footage of his behavior would be caught on camera, which Ms. Abid's father planned on turning over to law enforcement authorities so that Evans could be prosecuted for his illegal conduct.

Reiterman's Agents Stalk, Harass, Threaten, and Abuse Ms. Abid

While She's Attending Law School in New York

86.   In the fall of 2019, around the same time Ms. Abid's family was being victimized by one of Defendant Reiterman's agents, Ms. Abid was attending law school in New York. Ms. Abid noted that she was being followed by a white minivan for days on end and that a box of makeup had been left outside her door. In a particularly frightening incident, Ms. Abid called the New York Police Department ("NYPD") to escort her from school to her residence after noting that a man was

following her and waiting in her school's courtyard once her classes had ended for the day.

87.    In yet another incident, one of Ms. Abid's friends was followed by a man whose face was obscured with a baseball cap. The man told Ms. Abid's friend that he would pay her for information about Ms. Abid. Ms. Abid's friend ran away from him.

88.    Ms. Abid notified the Director of Public Safety ("DPS") at her school of her situation, who issued a safety warning to all security personnel on campus instructing them to ban Defendant Reiterman from her school's campus and any individuals asking about Ms. Abid's whereabouts. Ms. Abid and the DPS also discussed security measures she should take to protect herself, such as dressing in inconspicuous clothing and taking different routes to her residence every day so she couldn't be followed easily. Ms. Abid was terrified that she would be physically harassed and accosted like her parents had been in Florida.

89.    Around this time, Ms. Abid reported a break-in at her apartment to the NYPD. The door to her residence was so badly busted that it no longer fit in the door frame. While nothing was stolen, the NYPD

conducted a "sweep" of Ms. Abid's residence to search for any cameras that the perpetrator could have hidden in her belongings. The NYPD asked Ms. Abid if she knew of any individuals who might want to harm her or who might want to see video or photographs of her undressed. Ms. Abid informed the NYPD about how Defendant Reiterman had sexually assaulted her, how she had been stalked by a man in Florida who worked for Defendant Reiterman, what Defendant Reiterman had subjected her family to, and how she had been stalked recently in New York by a man who she suspected also worked for Defendant Reiterman.

90.    The NYPD advised Ms. Abid to move out of her residence immediately. The NYPD also suggested to Ms. Abid that she not pay for bills using her legal name because it could tip Reiterman off to her new location.

91.    Thereafter, Ms. Abid informed her school about the incident and was permitted to move into school housing.

92.    Ms. Abid consulted with local shelters for victims of sexual violence for assistance in using a pseudonym to pay for bills and to coordinate other safety measures to ensure her well-being.

93.    In and around December of 2019 and January of 2020, Ms. Abid received messages on a social media platform from a user identified as "~." This user threatened to spread pornographic images and video of Ms. Abid, which Ms. Abid knew didn't exist, and expressed an interest in creating a video of Ms. Abid in which she would be raped. As a result of this incident, Ms. Abid would later author two papers on Deepfakes to address ways to protect women from cyberstalking and online sexual violence.

94.    As a result of all these events, Ms. Abid, who still suffers from PTSD due to Defendant Reiterman sexual assaulting her, began experiencing flashbacks. She developed a tremor in her right leg that was so bad her counsel had to physically restrain her leg from shaking during a 2020 evidentiary hearing. Ms. Abid also stopped sleeping, stopped experiencing her menstrual flow, and developed nodules in her neck, all while still a student in her first year of law school.

### C. The Second Florida Suit — 2019

95.    In November of 2019, Ms. Abid's parents were served with a subpoena. The Court's Order authorized service of a "deposition subpoena" to determine the location of Ms. Abid. The subpoenas required production of

"any documents reflecting Defendant Farah Ali Abid's current address and physical whereabouts. As used herein, "documents" includes all "writings" of any nature within your possession, custody, or control, including but not limited to contracts, agreements, communications, correspondence, records, reports, journals, computer tapes or disks, emails, and text messages."

96.    The request was grossly overbroad and harassing. Moreover, it wasn't remotely justifiable based either upon the purported need for the deposition or the Court's prior order. Ms. Abid's parents was utterly despondent at the prospect of having to betray their daughter, who feared for her safety.

97.    After Ms. Abid's parents had already been served with a subpoena, Evans once again reappeared at their property to serve them

papers that they were already due to receive from counsel they had retained. There was absolutely no legal reason Evans had for doing this except to terrorize Ms. Abid's family.

98.   In December of 2019, Ms. Abid's parents retained counsel to quash the subpoena, but the Court denied their motion.

99.   To protect her parents who were utterly distraught at having to betray their daughter's location to Defendant Reiterman, Ms. Abid accepted service of the lawsuit via her parent's counsel.

100.  At an evidentiary hearing conducted in Florida on February 24, 2020, Defendant Reiterman's lawyer on cross-examination revealed that he not only knew Ms. Abid's location all along, but also the name of the school that she was attending. It's obvious that Defendant Reiterman's only reason for harassing and stalking Ms. Abid and her family was to inflict intense emotional anguish on the family and cause Ms. Abid, who Defendant Reiterman is obsessed with, more pain and suffering.

101.  The declarations that Defendant Reiterman's counsel submitted to the court in which Evans details his stalking campaign of Ms. Abid's

family are disturbing. In his report, Evans describes Ms. Abid's mother's physical appearance and makes guesses about her Muslim heritage. He also writes about how he spent hours over a period of days watching the family home and how he ran off once after Ms. Abid's mother activated the house safety alarm, which alerts the local police department to an intruder at the residence. Ms. Abid's mother did this after Evans had been relentlessly harassing her all morning. Chillingly, Defendant Reiterman's counsel states that Evans had even taken video footage of Ms. Abid when she lived in Florida, which Defendant Reiterman's counsel, and presumably Defendant Reiterman, had watched.

102.  On December 2, 2019, via counsel, Ms. Abid once again offered Defendant Reiterman's counsel her cellphone, any electronics she owned, and her personal computer for inspection. Defendant Reiterman's counsel steadfastly refused.

Content of the Second Florida Lawsuit (2019) — Defendant Reiterman Hires a Fraud to Fabricate Evidence to Implicate Ms. Abid in the Creation of the Blog Posts

103.  In the 2019 Florida lawsuit, Defendant Reiterman alleged that he had definitive proof linking Ms. Abid to the defamatory material posted online about him.

104.  Defendant Reiterman included a "cybersecurity" report from a man named Michael Roberts in his complaint. Roberts is an Australian citizen and resident and, per his own personal website, (https://rexxfield.com/rexxfield-founder-michael-roberts/), holds no certification in cybersecurity, computer forensics or any computer related fields for that matter. In fact, Roberts doesn't even hold a bachelor's degree. Roberts is quite an infamous figure and a simple search on the Internet will reveal a plethora of shocking stories.

105.  For example, in a lawsuit dating back to March 2006, an engineering expert, Gregory Perry, who provided proprietary course materials to employees of the United States Department of Defense, sued Roberts for placing child pornography, which contained graphic depictions of child torture and molestation and other morally repulsive content, on Perry's computers ¬¬¬after a business deal gone awry (https://www.slideshare.net/darrenmeade1/fedsuit-doc).       Perry

further alleged that Roberts unlawfully sold the plaintiff's proprietary course materials to other countries for profit and claimed that Roberts himself had created the course materials (https://www.slideshare.net/darrenmeade1/fedsuit-doc).

106. In another shocking story, a former client of Roberts claims that in 2012 Roberts was preparing to purchase a coding hack called "injection source code" that allows users to manipulate the metadata of a website and completely erase its contents, which is illegal in the United States. Roberts' actions apparently caught the interest of the attorney general of Arizona because Roberts was targeting a website called ripoffreport.com, which is based in Arizona (https://www.foxnews.com/tech/exclusive-online-reputation-manager-hacked-websites-to-inject-illegal-code).

107. Roberts was also featured in a Techdirt article (https://www.techdirt.com/2017/02/08/australian-guy-demands-techdirt-story-be-blocked-australia-over-comments/) for making a demand that an entire Techdirt article be removed from Google's index because Roberts thought the article defamed him, even though it made

no mention of him. According to the author of the Techdirt article, Roberts had posted a number of conspiracy theories on the Techdirt site in the comments section of a separate article. An attached exhibit in the Techdirt article shows a demand letter Roberts sent to Google Inc. demanding that Google remove any Google search term results stating Roberts engaged in, among other things, computer hacking, harassing individuals online, extortion, cyber terrorism, fraud, perjury, and death threats.

108.  Roberts briefly lived in the United States in the early 2000s, but abruptly left after his wife at the time had shot and killed a man inside their family home. Roberts was initially named as a suspect in the murder, though all articles online that named him as a suspect have been removed from the Internet.

109.  Ms. Abid retained an American certified cybersecurity expert specializing in electronically stored information forensics from the Tampa, Florida area named Dwayne Denny to address Roberts' report. Denny has thirty years of specialized knowledge and expertise in electronic surveillance gathering, counterintelligence, surveillance,

corporate security, digital forensics, data recovery, and related enterprise information technology. Denny also attended the February 24, 2020, evidentiary hearing that Judge Jung called.

110.   Denny noted that in Roberts' attempts to associate Ms. Abid with a Tutanota email address that Roberts claims effectively links Ms. Abid to all the defamatory Internet posts made about Defendant Reiterman, Roberts used an outdated and ineffective methodology. Moreover, Denny asserts that Roberts had not established a link between a blog post and the email address registered to that blog post — QueenFormation@tutanota.com. Denny asserts that the contents of Roberts' emails to Ms. Abid and the mechanism he used to create his exhibits were all fabricated by Roberts and only reflect what Roberts sent, not what he received. Rather than admit that Roberts was unable to associate Ms. Abid with the Tutanota email account, Roberts made the unsupported claim that Ms. Abid used Google and Tor and Proxies to thwart his efforts.

111.  Roberts   declared   that   he   sent   an   email   to QueenFormation@tutanota.com on January 6, 2019 at 8:02 PM, but

his declaration fails to include any standard cybersecurity custom, such as the metadata of the emails that he sent, which would have reflected crucial information such as the IP address of the sending computer or the systems he used to send the emails. Even the email addresses that Roberts sent his email to were truncated in his declaration, so it's impossible to determine where Roberts actually sent his email. Roberts claims that he conducted this test email in a controlled environment, when in fact he sent emails to multiple recipients. To the extent that Roberts' emails were sent to multiple parties at the same time, there is no way to differentiate or determine who actually opened and read Roberts' email and thus tripped what he calls a "Trip Wire" (this is not standard terminology used by cybersecurity experts). In fact, Roberts failed to include any exhibits that would reflect Ms. Abid, or anyone opened and read Email B on January 16, 2019.

112. Roberts alleges that Ms. Abid opened Email B from "behind the protection of Google Image Proxy IP address 64.233.173.160." That was intentionally written to mislead the reader and have them believe that Ms. Abid had willfully taken steps to obfuscate her online identity,

which is simply not the case. Google introduced Google Image Proxy in 2013 to provide a faster experience for users and reduce the spread of viruses and malicious code hidden in images. 64.233.173.160 is the IP address of Google Webservers located in Brooklyn. Google's email server IP address 64.233.173.160 could potentially be found in any of Google's 1.5 billion Gmail subscribers' emails. The IP address 64.233.173.160 in no way reflects the geographic location of the user or their IP.

113. The cybersecurity industry standard and widely accepted methodology to locate a party or collect data from an email recipient is to use a Tracking Pixel. A tracking pixel is a 1×1 pixel (.gif) containing hidden HTML code which is loaded when a user visits a website or opens an email. It is useful for tracking user behavior and conversions. Roberts clearly renamed the well-known widely used methodology to "Trip Wire" in efforts to make what he did seem proprietary and more robust, or perhaps because Roberts doesn't have a background in cybersecurity, so he doesn't know what a Tracking Pixel is. In any event, Tracking Pixels often obtain the type of web-browser's

information, the computer's operating system, and the user's Wide Area Network (WAN) IP address assigned by the user's Internet Service providers (ISP). In other cases, without any interaction on the part of the recipient, tracking pixels will return the computer's Local Area Network (LAN) IP address. The LAN IP is useless in determining the user's identity and location.

114. Roberts declared he sent an email to QueenFormation@TUTANOTA.com in efforts to uncover the user's identity and location. The data Roberts alleges he received as a result of his "Trip Wire" was the IP address, 192.168.116.20. 192.168.116.20 is not an external WAN IP used on the internet. In fact, any IP address starting with the prefix "192.168." is not an Internet IP address. It is an IP address range reserved for LANs. In fact, the majority of routers sold or leased in the United States of America start with 192.168. As such, it would be impossible to ascribe an IP address starting with 192.168 to anyone, much less Ms. Abid. The IP address, 192.168.116.20 would only be useful if Roberts had: A) obtained the user's WAN IP address, B) Subpoenaed the ISP to identify the party

who used the IP on the date of his email, C) Obtained the Router that was associated with the WAN IP, and D) analyzed the router to identify the device that used the LAN IP, 192.168.116.20. Roberts jumped to a conclusion by omitting steps A-C.

115.   Before Roberts could claim his "Trip Wire" successfully linked Ms. Abid's FALI@ABID@Gmail.com email account to QueenFormation@TUTANOTA.com, the results data would need to reflect the Router WAN IP address for both responses to be the same. This was not the case. Roberts received no router WAN IP address and the information he did receive was conflicting.

116.   Unable to obtain any evidence that Ms. Abid was associated to QueenFormation@TUTANOTA.com, Roberts, in paragraph 10 of his declaration, abandons science and relies solely upon his "experience" to associate Ms. Abid with the QueenFormation@TUTANOTA.com email and four WordPress posts.

117.   Roberts attempted to identify the owner of the email address QueenFormation@TUTANOTA.com and failed.

118.   Roberts alleges that Ms. Abid opened her email from behind the protection of Tor. The Tor Network is a free worldwide internet traffic overlay that consists of over seven thousand relays that assist users in hiding their internet activity from network surveillance. To support his claims, Roberts offered up the LAN IP address, 192.168.116.20, which is not a Tor proxy IP address.

119.   Roberts' declaration and exhibits offer no evidence that would reflect Ms. Abid sent electronic communications from New York, Florida, or anywhere for that matter.

120.   None of the information acquired via subpoena implicates Ms. Abid and much of its written in an editorial way to falsely lead the reader into assuming that the publishing of these Blog posts was somehow done via conspiratorial methods. For example, Defendant Reiterman states that Tutanota.com and Yandex.com email addresses were used in publishing these blog posts and are "rare," and suspect when in fact both are relatively popular email services originating in Germany and Russia that enjoy millions of users.

121. Even the IP address, 186.65.13591 that Defendant Reiterman says is registered to the Imgur and Scribd accounts used in the blog posts isn't a valid IP address. Yet Defendant Reiterman claims that this IP address is a data center in Stockholm, Sweden used by nefarious individuals who want to conceal their identity on the internet.

122. Defendant Reiterman's counsel referred to Roberts' declaration as part of a "mountain of evidence" indicating that Ms. Abid was responsible for the Blog Posts and all the sexual assault allegations surrounding Defendant Reiterman's time at Harvard Law School. Yet, there's not one iota of evidence that Ms. Abid had anything to do with the "defamatory campaign" Defendant Reiterman says she singlehandedly spearheaded.

123. Defendant Reiterman, by his own account, has spent over $1 million in pursuing Ms. Abid with his vexatious litigation and appears to have an unending stream of income at his disposal to continue harassing Ms. Abid.

124. For the entirety of a court-ordered mediation conference that took place in May of 2020, Defendant Reiterman's counsel repeatedly

demanded that Ms. Abid sign a sworn statement declaring that Defendant Reiterman never sexually assaulted her and that she created all the Internet sites about Defendant Reiterman. Ms. Abid refused. Defendant Reiterman could hold a gun up to Ms. Abid's head and she still would not write such a statement because it's untrue.

Ms. Abid has Been Contacted by Other Parties about Reiterman's Sexual Misconduct

125. Ms. Abid served as a witness in the Washington D.C., California, New York bar associations, and National Conference of Bar Examiners' (NCBE) character and fitness investigation of Defendant Reiterman.

126. Each state in the United States has an independent licensing board that conducts its own painstaking investigations of persons applying to practice law in that state. Aside from passing a state's bar exam, individual applicants must pass an extremely rigorous "character and fitness" assessment in which the state conducts a thorough background check of applicants to determine if they possess the requisite moral character to be an attorney in the U.S.A. According to a recent Reuters article, less than 1% of California state bar

applicants are denied admission each year for failing the fitness and character assessment (https://www.reuters.com/legal/legalindustry/fake-lawyer-real-question-do-bar-morality-requirements-serve-purpose-2021-11-23/). Once applicants are denied admission, they bear the burden of proving by a preponderance of the evidence that they possess the character and fitness required of members of the bar. According to the NCBE, certain types of reported conduct are likely to trigger further investigation, including unlawful conduct, academic misconduct, neglect of financial responsibilities, employment misconduct, and violations of court orders. Evidence of mental or emotional instability and evidence of substance abuse issues may also trigger an investigation (https://abaforlawstudents.com/2013/12/01/bar-hurdle-character-fitness-requirement/).

127. By his own account, Defendant Reiterman has been denied admission to practice law in the United States. Yet, Defendant Reiterman continues to cast blame and assert that Ms. Abid is the reason he can't practice law in the U.S.A. The reality is that Defendant

Reiterman's own conduct have placed him in the situation that he finds himself in.

128. Defendant Reiterman's persistent stalking and aggressive harassment of Ms. Abid and her family is extreme, outrageous and has caused Ms. Abid, her friends, and her family severe trauma. Ms. Abid respectfully requests that this Court do everything in its power to mitigate Ms. Abid's existing harm and prevent Defendant Reiterman from continuing his campaign of abuse.

## COUNT I

## MALICIOUS PROSECUTION

129. Ms. Abid realleges the allegations contained in Paragraphs 64 through 75, as if set forth fully herein.

130. Defendant Reiterman instituted his Complaint and Injunction against Ms. Abid in California knowing it was without any legal basis whatsoever in fact or law and without any prima facie cause of action in California, whatsoever, and Ms. Abid ultimately prevailed in the California case when the judge dismissed the action for lack of jurisdiction, this having a bone fide termination.

131.   That shortly after the California court dismissed Defendant Reiterman's suit for lack of jurisdiction, Defendant Reiterman filed a motion for injunction and suit against Ms. Abid in Florida in 2019.

132.   Defendant Reiterman's Florida Complaint alleged nearly identical matters to the California complaint and made further additional false allegations.

133.   Defendant Reiterman wrongfully initiated and maintained these civil proceedings against Ms. Abid. These actions demonstrate a clear intent to willfully, wantonly, oppressively, and maliciously cause Ms. Abid to be prosecuted merely to coerce Ms. Abid to write a retraction falsely stating that Defendant Reiterman didn't sexually assault her.

134.   As a direct and proximate result of these frivolous and malicious lawsuits, one of which Ms. Abid prevailed in when the judge ordered it to be dismissed for lack of jurisdiction, Ms. Abid has paid or incurred expenses for attorney fees and costs in defending the frivolous and malicious civil complaints filed by Defendant Reiterman.

135. As a further direct and proximate result of Defendant Reiterman's willful misconduct, Ms. Abid reserves the right to make a claim for Punitive Damages pursuant to Fla. Stat. 768.72.

WHEREFORE, Ms. Abid respectfully requests that this Court enter judgment in her favor and against Defendant Reiterman and order and award of compensatory damages to make Ms. Abid whole for the harm caused to her, in an amount to be determined at trial but believed to exceed $75,000. Upon proof, Ms. Abid further requests an award of punitive damages to punish Defendant Reiterman for his outrageous conduct, in an amount to be determined at trial.

## COUNT II

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

136. Ms. Abid incorporates by reference paragraphs 1 through 128 as if fully set forth herein.

137. Defendant Reiterman's conduct, as discussed above, was intentional. In the alternative, his conduct was reckless, in that he intended to terrorize Ms. Abid and her friends and family via methods of stalking, harassment, extortion, intimidation, cyberstalking, and

trespass when he knew or should have known that emotional distress to Ms. Abid would result.

138. Defendant Reiterman's conduct to Ms. Abid was outrageous, especially his direction to his agent Nicholas Evans to commit battery against Ms. Abid's father, which caused Ms. Abid intense emotional anguish. Defendant Reiterman's conduct exceeds all bounds of decency and is to be regarded as odious and utterly intolerable in a civilized community.

139. Defendant Reiterman's conduct caused Ms. Abid extreme emotional distress. For the past two years, Ms. Abid has lived in a state of humiliation, and fear that at any moment, Defendant Reiterman could be spearheading a new campaign to abuse, harass, and stalk her and her family, regain psychological control over Ms. Abid, and induce her to commit suicide.

140. As a direct result of Defendant Reiterman's conduct as alleged herein, Abid has suffered a discernible physical injury.

141. Abid's physical injury has been caused by the psychological trauma resulting from Reiterman's conduct as alleged herein.

142.  Defendant   Reiterman's actions in causing and engaging in intentional infliction of emotional distress have caused injury to Abid.

WHEREFORE, Ms. Abid respectfully requests that this Court enter judgment in her favor and against Defendant Reiterman and order and award of compensatory damages to make Ms. Abid whole for the harm caused to her, in an amount to be determined at trial but believed to exceed $75,000. Ms. Abid further requests an award of punitive damages to punish Defendant Reiterman for his outrageous conduct, in an amount to be determined at trial.

## COUNT III

### ABUSE OF PROCESS

143.   Ms. Abid incorporates by reference paragraphs 1 through 128 as if fully set forth herein.

144.  Defendant Reiterman has willfully and intentionally made illegal, improper, or perverted use of process by maintain the lawsuits described above on a victim if his own misconduct.

145.  Defendant Reiterman had an ulterior motive and purpose in exercising the process which was designed for revenge and an effort to punish Abid for issues he erroneously blamed her for.

146.  Defendant Reiterman's actions through abuse of process have caused injury to Abid.

WHEREFORE, Ms. Abid respectfully requests that this Court enter judgment in her favor and against Defendant Reiterman and order and award of compensatory damages to make Ms. Abid whole for the harm caused to her, in an amount to be determined at trial but believed to exceed $75,000. Ms. Abid further requests an award of punitive damages to punish Defendant Reiterman for his outrageous conduct, in an amount to be determined at trial.

## COUNT IV

### INJURIOUS FALSEHOOD

147.  Ms. Abid incorporates by reference paragraphs 1 through 128 as if fully set forth herein.

148. As alleged herein, Defendant Reiterman has made several false and defamatory statements about Abid.

149.  Defendant Reiterman has published (written or orally) these false and defamatory statements about Abid to a third party.

150.  Defendant Reiterman has made these defamatory statements regarding Abid with the requisite intent and with malice.

151.  Defendant   Reiterman's actions by engaging in injurious falsehoods have caused injury to Abid.

WHEREFORE, Ms. Abid respectfully requests that this Court enter judgment in her favor and against Defendant Reiterman and order and award of compensatory damages to make Ms. Abid whole for the harm caused to her, in an amount to be determined at trial but believed to exceed $75,000. Ms. Abid further requests an award of punitive damages to punish Defendant Reiterman for his outrageous conduct, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Ms. Abid respectfully requests the following relief:

A.     That this Court enter judgment in Ms. Abid's favor and against Defendant Reiterman;

B.      That this Court enter an order preliminarily and permanently enjoining Defendant Reiterman, and all of his respective officers, agents, servants, representatives, attorneys, assigns and successors in interest, and all other persons acting in concert with him, from continuing to harass and stalk Ms. Abid and her family;

C.      That this Court enter an order awarding compensatory damages to Ms. Abid resulting from Defendant Reiterman's intentional infliction of emotional distress, harassment, and stalking, in an amount according to proof at trial but believed to exceed $75,000.00;

D.      That this Court enter an order awarding punitive damages to Ms. Abid, sufficient to punish and deter Defendant Reiterman's intentional and malicious conduct;

E.      That Ms. Abid be awarded his reasonable attorneys' fees and costs for prosecuting this action; and

F.      That Ms. Abid be granted such further relief as the Court may deem just and equitable.

**PLAINTIFF ABID HEREBY DEMANDS A TRIAL BY JURY**

Dated this day of May 2, 2022          Respectfully submitted,


                                       /s/ Luke Lirot

Luke Lirot, Esquire
Florida Bar Number 714836
Luke Charles Lirot, P.A.
2240 Belleair Road, Suite 190
Clearwater, Florida 33764
Telephone: (727) 536-2100
Facsimile: (727) 536-2110
Email: luke2@lirotlaw.com
Alternate email addresses:
office@lirotlaw.com
krista@lirotlaw.com
rachel@lirotlaw.com
bedr@lirotlaw.com
Attorney for
Defendant/Counterplaintiff Abid

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 2, 2022, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which will

send a notice of electronic filing to all parties in this case.

/s/Luke Lirot
Luke Lirot, Esquire
Florida Bar Number 714836